The appellant appeals from a decree of the court of chancery granting the respondent an absolute divorce on the ground of extreme cruelty under P.L. 1923 p. 494. The parties were married January 21st, 1899, and thereafter lived in Philadelphia until 1909, when they came to Ventnor, Atlantic county, this state, and resided at No. 23 South Weymouth avenue, until February 25th, 1926, at which time they separated. She continued to live at the home, with their daughter, Nellie, who was then nineteen years of age, and he resided with their son, Julius, twenty-one years of age, in Philadelphia.
The petition in the present case was filed February 23d 1926, and alleges a progressive treatment of tormenting, humiliating, assaulting and abuse by the defendant against the petitioner, failure to provide food, clothing and other necessities, threats of bodily harm, a physical assault on July 10th, 1925, abuse of marital relations, accusations of infidelity, alienation of the son's affections, and cruelty towards the daughter. With one exception, the petition is *Page 43 
lacking in specific instances, and it is rather difficult to take up the proof or disproof of any one allegation.
The petitioner had been engaged, since January 3d 1925, as an announcer and accompanist in the radio station WPG, in Atlantic City, and received a salary of $3,000 per annum, which position occupied considerable of her time, especially during the night. The daughter, Nellie, as a rule accompanied her mother to the studio, and remained until she had completed her duties, and on many occasions they returned home at late hours, to which the defendant objected, claiming that his reason for so doing was that the petitioner had stated that liquor was served where she and the daughter dined. The petitioner testified that on Mother's Day, May 10th, 1925, while both parties, together with their two children, were eating dinner, the defendant, speaking to his son, Julius, said: "It is too bad that you haven't a mother that you can be proud of. It is a shame that your mother can't compare with your friend's mother." She then stated: "I commenced to cry, and he, `ha, ha, ha,' laughed, and threw my plate, with the chicken neck and dob of gravy on it to me, and I got up and left." The petitioner and her daughter, from that time on, refused to eat with the father and son at the table, but insisted on having their meals brought by the servant, Trudy, either to their bedroom, or in the sun parlor. The petitioner is not supported by any of the witnesses in respect to this event, in its entirety. The testimony of the daughter, Nellie, who sympathized with the mother's cause, corroborated her as to the statement alleged to have been made by the defendant, but not as to his throwing the plate. The defendant and his son, Julius, who seems to favor his father, deny both the statement and the assault. The only other specific instance of physical violence testified to by the petitioner, that occurred within the time recognized by the statute, happened on the 10th day of July, 1925, when she alleged she was about to take some lamb stew from the kitchen to the daughter, Nellie, who she claimed was ill, and stated that defendant grabbed her hand, wrenched her arm, tore the ligaments away from her finger, and scratched her *Page 44 
with the fork, and that her hand is permanently injured, preventing her from practicing at her music more than a few minutes at a time. She admits that after the fork had been taken away by the defendant, she obtained a spoon and struck him with it. The fork was produced in court and admitted in evidence, and appeared to be much bent and out of shape. Both the son and daughter testify that they did not enter the kitchen until they heard the mother make an outcry, and when they did, she was striking the father with a spoon. The son also testifies that the mother was playing the piano in the evening of the day this altercation took place. The servant, Trudy, testified that when she was about to serve the dinner in the dining room, the petitioner, who had been out attending some social affair with her daughter, came into the kitchen and said that she and her daughter were going right out again, and wanted something to eat. Taking the fork from Trudy's hand, she started to place some of the lamb stew on a plate. The defendant desired to have the meal served on the dining room table, and grabbed the fork from the petitioner's hand, taking hold of the prongs. She stated that there was no wrestling, and that the defendant did not at any time strike the petitioner, but that the petitioner, after the fork was taken away from her, grabbed a spoon and "spanked his pants for him." She also testified that she used the fork shortly after it had been taken away from the petitioner by the defendant, and washed it, and at that time it was not in the same condition as shown in court. It also appears that some eight days after this alleged assault with the fork the petitioner was treated by a Dr. Fennimore, who was also engaged as a performer in the same radio station as the petitioner, and who testified that the tendon between the first and second finger of her hand was then partially ruptured. It appears that he treated the hand on three different occasions. Both the servant and son testified that the petitioner never complained to them about the injury. The petitioner also testified, in support of the charges contained in the petition, that their home was never properly heated, and that the food furnished by the defendant was of *Page 45 
poor quality and insufficient quantity. In respect to the heating of the house, she is supported by her daughter, Nellie, and to a certain extent by Dr. Fennimore and a witness by the name of Mrs. Johnson, each of whom visited the home on three or four occasions and testified that the house was cold and very uncomfortable. The defendant and his son, Julius, as well as the servant, Trudy, all state that the home was sufficiently heated during the cold weather; and there is evidence by the son and father that the petitioner would at times, in cold weather, open the windows while the defendant was reading, for the sole purpose of annoying him. There was also testimony offered by one Marvin Reed, that he had installed an electrical blower for the defendant, so that a better draft could be obtained for the furnace. However, it appears without dispute that all members of the family, including the defendant, resided in the home during the winter season, without any serious result. There is ample evidence given by the daughter, son and servant, to warrant the conclusion that the food furnished by the defendant, while plain, was substantial and nourishing, and of sufficient quantity to supply all the inmates of the home. The petitioner complained that the household affairs were managed by the defendant, but an examination of the testimony would indicate that this was with her consent, for the reason that much of her time was taken up at the radio station, and she also informed Trudy, the servant, when employing her, that the defendant had charge of purchasing the household supplies, and that she should inform him as to what was required in furnishings and supplies. The servant, Trudy, also testified that at different times the defendant would give her money or a check for the daughter or wife, which was refused by them, and on one occasion the petitioner told the servant to take the money back to the husband and tell him "to go to hell." The petitioner, when testifying, admitted that she threw a rug down the stairs from the second floor, hitting her husband on the head; and when asked by counsel if she at that time was in temper, she replied: "No. I wasn't in temper, no. I just thought it *Page 46 
would improve his coiffure." The petitioner also claimed that when their son, Julius, was ill, the defendant locked the doors of the sickroom, and would not allow her to enter, but admitted that her daughter, Nellie, and the doctor were able to gain admittance. Both the father and son testified that the room had two doors, neither of which was locked, and that the mother entered the room twice when the son was sick in bed, but did not assist in nursing or caring for him during his illness, which was done by the father. The petitioner further testified that by reason of her husband's actions, that from 1923 to 1926 she was nervous, depressed and couldn't sleep, but Dr. Fennimore testified that he noticed her health at the time of the trial, which was November 15th, 1927, was not as good as it was preceding the time when she and her husband separated. On February 25th, 1926, which was two days after the petition in the present case was filed, the petitioner without any apparent immediate cause, changed the locks and barred the doors, so that when the defendant returned home in the evening, he was unable to gain admittance, and it does not appear that he ever returned. This home was conveyed to the petitioner by the defendant in 1919, and he testified that the fair value of the property was $20,000. There is a mortgage on the property at the present time for $1,500, the interest on same having been paid at all times by the defendant.
None of the other charges contained either in the petition or testimony of the petitioner are supported or substantiated by sufficient evidence to warrant further consideration. It appears that paragraph 4 of the petition, which charges that prior to May 7th, 1925, the defendant was guilty of gross abuse of marital rights, and acts of degradation and degeneracy, was entirely ignored at the hearing, and no effort was made to prove same, nor was the allegation contained in paragraph 8, to the effect that the husband accused the wife of infidelity, substantiated. These charges, being of such a serious nature, it is fair to assume that the respondent was unable to support them by any evidence, and *Page 47 
that the sole purpose in making the allegations was to embarrass the appellant.
It is impossible to define, with accuracy, the exact meaning of the term "extreme cruelty," as used in the statute, which provides for an absolute divorce on that ground, but this court, in Doty v. Doty, 92 N.J. Eq. 660, has approved of the rule as stated by Vice-Chancellor Van Fleet, in Black v. Black,30 N.J. Eq. (at p. 221), wherein he said: "To justify a divorcea mensa et thoro, actual physical violence need not be proved, but such conduct, by the husband, must be shown as will justify the court in believing that, if he is allowed to retain his power over his wife, and she is compelled to remain subject to him, her life or her health will be endangered, or that he will render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. Close v.Close, 10 C.E. Gr. 529; English v. English, 12 C.E. Gr. 585."
We are of the opinion that the evidence tending to prove extreme cruelty falls far short of establishing a case in favor of the petitioner. It is undoubtedly true that there was more or less wrangling between the parties, generally caused by incompatibility of temper, and for that reason they did not live as happily together as they should have done; still, no case of extreme cruelty is proved. The defendant may have been somewhat penurious in his dealings with his family, and old-fashioned in his ideas as to the bringing up of his daughter, and how the household affairs should be managed, but the petitioner was temperamental, nervous, high-strung and inclined to exaggerate and color the facts relating to her married life. The records show that many of the acts complained of were as much the fault of the petitioner as of the defendant; and it is well settled that the complaining party will not be granted a divorce where the cruel conduct relied on is provoked and brought on by the petitioner, unless the conduct complained of is excessive and out of proportion to the provocation; and we can find no evidence in this case which supports such a fact. Incompatibility of temper and the ordinary misunderstandings, *Page 48 
which are more or less characteristic of the marriage relations in many cases, have not been made grounds for divorce in this state, and those who are married must bear the real or fancied burdens they have assumed, unless the conduct of one entitles the other, that other being without fault, to a severance of the relation for one or other of the statutory causes.
Inasmuch as the proofs are insufficient to make a case of extreme cruelty under the statute, we conclude that the decree must be reversed, and the petition dismissed.
For affirmance — None.
For reversal — THE CHIEF-JUSTICE, TRENCHARD, CAMPBELL, LLOYD, CASE, BODINE, DALY, VAN BUSKIRK, McGLENNON, KAYS, HETFIELD, DEAR, WELLS, JJ. 13.